# Richmond

## W. A. WILLEROY *v.* COMMONWEALTH OF VIRGINIA.

October 11, 1943.

Record No. 2715.

Present, All the Justices.

. The opinion states the case.

*W. A. Willeroy*, for the. plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Mr. W. A. Willeroy lives in Richmond and is the owner of a home there at which, in a limited way, he raises chickens.

On the afternoon of October 2, 1942, two dogs came to it and killed five of them. Fearing or anticipating their return, on the afternoon of the next day, he took his sixteen-gauge single-barrel shotgun and went on guard. They did come back; their identity is not in dispute. One of them was small and the other larger. The smaller came first and circled where the chickens had been killed. Nothing was done as to him. Then the larger dog came through his privet hedge, made for the chicken yard and was up against its fence, seeking to break it down, when he saw Mr. Willeroy and bolted. Willeroy shot and killed him. Shortly thereafter two policemen came and arrested him on a warrant charging him with cruelly and

unnecessarily killing one dog, the property of Mrs. Thomas J. Hammond. Willeroy went with them to Police Headquarters. The warrant was read to him, and he was released on his own recognizance. He then returned to his home and found the small dog still there. After repeated ineffectual attempts to drive him away, he killed him. The large dog was killed before supper and the small dog after supper.

In the police court he was tried, convicted and fined $50.00. From that sentence he appealed to the Hustings Court of the City of Richmond, where his case was heard without the intervention of the jury. He was there fined $25.00, coupled with the further provision that in the event of his failure to pay he should be sent to jail.

That judgment is based upon what he did before supper and from it he has obtained a writ of error.

From time immemorial people have been attached to their dogs and their dogs to them. Tobit's dog went with him. The anthology of every land is filled with eloquent tributes of affection, but their record is not spotless. Atavistic maraudic strains inherited from a savage ancestry sometimes develop; they revert to type and kill from a love of slaughter. It is then that they become a public nuisance and a public menace, and to them the ordinary rules of self-defense apply, for men may protect their property as they may protect their person.

"A ferocious and vicious dog roaming at large, which is accustomed to bite mankind and animals, or which is endangering the safety of persons and property, is a common enemy and a public nuisance, and may be lawfully killed;" * * * 3 Corpus Juris Secundum 1331.

"The owner of a domestic animal or fowl which is placed in jeopardy by the attack of a dog has the right to kill the dog for the protection of his property. This rule exists not only at common law, but under statutes declaratory thereof, obtaining in most American jurisdictions; and in so far as these statutes are more narrow than the common law it is held that the common-

law right continues as to cases outside the scope of the statutes." * * * 2 Am. Jur. 764.

In an extended note on this subject appended to *Ex Parte Minor*, 203 Ala. 481, 83 So. 475, 10 A. L. R. 687, governing rules are thus stated:

"The owner of a domestic animal or fowl which is placed in jeopardy by the attack of a dog has the right to kill the dog for the protection of his property." * * *

"It is ordinarily held that to justify the killing of a dog for the protection of a domestic animal or fowl, he must be presently attacking or threatening the animal or fowl. That he has in the past attacked animals or fowls will not justify the killing of a dog." * * *

"To warrant the killing of a dog for the protection of a domestic animal or fowl, the circumstances must be such as to create a reasonable belief that such killing is necessary to prevent injury to the animal or fowl."

In *Breedlove* v. *Hardy*, 132 Va. 11, 110 S. E. 358, the right of an owner to protect his fowls is thus stated:

"The owner of domestic animals or fowls has the right to defend them from injury or destruction through the attacks of other animals, but the extent of such right of defense necessarily depends on the circumstances and necessities of the particular case—that is, whether or not the right is reasonably or properly exercised, so as to make it lawful and justifiable."

This case is relied upon by the Commonwealth. There was a verdict for the defendant which the court set aside because of an erroneous instruction. The dogs which were shot had been chasing and worrying the defendant's turkeys all the summer. It appears to have been a sporting proposition with them; they were not killers.

Reliance was placed upon Section 4, Session Acts, 1918, p. 622. The court said that section dealt with the power of game wardens and neither extended nor limited common law rights.

It is to be remembered that that was a civil action for damages. The court said:

"Where the proof of the killing of the dog is clear, the burden is then upon the defendant, who justifies his action to show the necessity therefor."

This is a criminal case, and the burden is upon the Commonwealth to show that the accused is guilty beyond all reasonable doubt. Surely he could not be sent to jail if the Commonwealth, without more, showed that he killed a dog.

Code sections directly involved are Section 4554 and Sub-section 71 of Section 3305, brought forward from Session Acts, 1930, pp. 634-660, Sub-section 70, which reads:

"Dogs killing or injuring sheep or other live stock or poultry.—It shall be the duty of any warden who may find a dog in the act of killing, injuring, worrying or chasing sheep, or killing or injuring other live stock, to kill said dog forthwith whether such dog bears a tag or not, and any person finding a dog committing any of the depredations mentioned in this section, shall have the right to kill such dog on sight. The board of supervisors of any county or any magistrate or other court, shall have the power to order the game warden or other officer to kill any dog known to be a confirmed poultry killer, and any dog killing fowls for the third time shall be considered a confirmed poultry killer. Any warden or other person who has reason to believe that any dog is killing live stock, or committing any of the depredations mentioned in this section, but which has not been found in the act, shall apply to a magistrate of the county, city or town wherein such dog may be, who shall issue a warrant requiring the owner or custodian, if known, to appear before him at a time and place named therein, at which time evidence shall be heard, and if it shall appear that such dog is a live stock killer, or has committed any of the depredations mentioned in this section, the dog shall be ordered killed immediately, which the warden, or other officer designated by the magistrate to act, shall do."

This section is intended to cover "dogs killing or injuring sheep or other live stock or poultry," and in terms provides that "any person finding a dog committing any of the depredations mentioned in this section" shall have the right to kill such dog on sight. The killing of fowls is one of the depredations mentioned.

When Rover ran across the lawn and charged against this chicken-wire fence, with every prospect of breaking it down, we can see the fluttering terror of these pent-up pullets. We have a depredation mentioned in the statute. The danger was imminent, for this fence was made to keep chickens in and not dogs out. This dog was caught *in flagrante delicto*. Willeroy did not have to wait until it had bit a hen. It was then that the dog saw the owner, ran and was shot—all in a moment of time.

Many cases say that the danger must be imminent. What is meant by imminent danger is considered at length in *Aldrich* v. *Wright*, 53 N. H. 398, 16 Am. Rep. 339, a leading case mentioned time and again in subsequent decisions. There minks were killed out of season. They chased geese out of a pond and went to rest on an island, where the owner of the flock shot and killed them. The judgment against him was reversed. It was said:

"Under this rule the jury could weigh all such facts as previous molestation and annoyance, and the effectiveness to be expected from any other means of prevention, as well as the facts of the situation presented to the defendant on the night of the killing, and any provocation in that situation." *Wood* v. *Stotski*, 148 Md. 508, 129 A. 646.

This rule we have recognized by statute, for a dog thrice guilty is beyond the pale.

Willeroy not only knew what this dog had already done, but he had before him unmistakable evidence of what it was then trying to do.

The argument on behalf of the Commonwealth leads to this conclusion, characterized in the *Aldrich Case* as astonishing: If a pack of hounds in pursuance of a flock of sheep were to kill half of them and run off when their

owner appeared, he could do nothing, for the sheep surviving were not then in imminent peril and those dead in none at all. And if it be said that dogs who kill chickens have privileges not enjoyed by those who prefer sheep meat, we must remember that the statute denounces "dogs killing or injuring sheep or other live stock or poultry."

If the press be dependable, the Richmond area has long been pestered by predatory dogs; indeed, something in the nature of a vigilance committee has at times been organized. Surely one of those who shot this dhole as he fled from an unfinished table plainly could not be successfully indicted.

Willeroy has not been proven guilty beyond a reasonable doubt and has not been proven guilty at all. He did what any ordinary man would have done to protect his chickens. He is not vindictive, and he is not cruel. Witness after witness, without contradiction, has said: "I never knew, or even heard, of his being cruel, or even unkind, to anyone or anything."

*Reversed and dismissed.*